1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              -  -  -

4     BAYER INTELLECTUAL PROPERTY        )   Civil Action
      GMBH and BAYER PHARMA AG,          )
5                                        )
                Plaintiffs,              )
6                                        )
           v.                            )
7                                        )
      WARNER CHILCOTT COMPANY,           )
8     LLC, WARNER CHILCOTT (US),         )
      LLC, and WARNER CHILCOTT PLC,      )
9                                        )
                Defendants.              )   No. 12-1032-GMS
10                             -  -  -

11

12                        Wilmington, Delaware
                          Monday, July 14, 2014
13                             9:30 a.m.
                          Markman Hearing

14                             -  -  -

15    BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.

16    APPEARANCES:

17              RICHARD D. KIRK, ESQ., and
                STEPHEN B. BRAUERMAN, ESQ.
18              Bayard, P.A.
                         -and-
19              MATTHEW R. FORD, ESQ.,
                SUNDEEP K. (R0B) ADDY, ESQ., (Denver, CO), and
20              ANDREW C. MacNALLY, ESQ.
                Bartlit Beck Herman Palenchar & Scott LLP
21              (Chicago, IL)

22                             Counsel for Plaintiffs

23

24

25

```
 1    APPEARANCES CONTINUED:

 2            STEVEN J. BALICK, ESQ.
              Ashby & Geddes
 3                    -and-
              ERIC R. SONNENSCHEIN, ESQ., and
 4            JEREMY COBB, ESQ.
              Covington & Burling LLP
 5            (Washington, D.C.)

 6                            Counsel for Defendants

 7                         -  -  -

 8

 9            THE COURT:  Good morning.  Please, take your

10    seats.

11            (Counsel respond "Good morning.")

12            THE COURT:  We will wait a few moments and see

13    if GSA does anything about the temperature of the courtroom.

14    Let's start with introductions.

15            MR. KIRK:  Good morning, Your Honor.  Richard

16    Kirk from Bayard.  My partner Stephen Brauerman joins me.

17    We are joined by our partners from Bartlit Beck Herman

18    Palenchar & Scoot Matthew Ford, who I think will be the

19    chief presenter, Andrew MacNally, and Rob Addy.

20            We are also joined by Bayer's representative,

21    the chief patent counsel for Bayer Health, Aseem Mehta.

22            THE COURT:  Mr. Lind didn't want to make the

23    trip?

24            MR. FORD:  No, he couldn't make it today.

25            MR. BALICK:  Good morning, Your Honor.
```

 1                THE COURT:  Good morning.

 2                MR. BALICK:  Steven Balick from Ashby & Geddes

 3      on behalf today.  I am joined from the Covington & Burling

 4      firm by Eric Sonnenschein and Jeremy Cobb.  Also, Thomas

 5      Poce from the company.  And we have a technician with us

 6      this morning, Kurt Evans.

 7                THE COURT:  All right.

 8                Counsel, I have a letter from Mr. Kirk.  Is this

 9      agreed, this way of proceeding?

10                MR. SONNENSCHEIN:  Yes.

11                MR. FORD:  It is.

12                THE COURT:  Okay.

13                MR. FORD:  Thank you, Your Honor.  Your Honor, I

14      have a copy of the PowerPoint that I am giving.

15                THE COURT:  You might want to pass up one for my

16      court reporter as well.

17                MR. FORD:  Your Honor, as you know, the parties

18      have agreed to the order set forth in the letter.  Of

19      course, if you ever want to deviate from that, please, let

20      us know.

21                THE COURT:  I don't need an invitation for that,

22      counsel.

23                MR. FORD:  I have a PowerPoint presentation set

24      up.  I am happy to proceed with the PowerPoint.  Again, if

25      you want to talk about a different area, we can talk about

1    wherever the Court wants to go.

2              What I would like to start with is, if it is all

3    right with the Court, on the claims at issue here or the

4    claims that we are asking the Court to construe.

5              Your Honor, I put on this white board here the

6    claim broken down by, essentially by clauses, more or less.

7    Given my height, I can only refer to some part of it.  Eric

8    can probably get to higher parts of it.  But I want to give

9    you an overview of what is claimed here.

10             It is a contraceptive regimen that first has a

11   first and second hormone component.  And the first hormone

12   component contains two pieces, a progestin and an estrogen.

13   We are going to be discussing the estrogen a good deal

14   today.  But both are part of the contraception regimen.

15             The second hormone component consists

16   essentially of an estrogen, one of the two ingredients that

17   is in the combined pill, as well as placebo pills that are

18   between these two hormone components, such that the total

19   cycle, when you put all these pills together, it is at least

20   28 days.

21             What we are discussing today is this last part,

22   which the parties have been referring to as the "whereby"

23   clause.  I think both of us have been using it somewhat

24   specifically to refer to the last portion of the whereby

25   clause, which really is the direct object of the clause

1    itself.

2             So in full, the clause reads, "...whereby the

3    low effective estrogen content" -- this is a term for

4    construction -- "and low total hormone content provides high

5    contraceptive reliability, low incidence of follicular

6    development, and satisfactory cycle control, with reliable

7    avoidance of intracyclic menstrual bleeding and undesirable

8    side effects."

9             So those are the terms that we have before you.

10            A first dispute between the parties is what to

11   make of this portion of the whereby clause, whether it is a

12   single limitation, which is what Bayer proposes, or whether

13   it is a series of individual limitations, which is Warner

14   Chilcott's position.

15            Your Honor, there are three reasons why you

16   should adopt Bayer's construction, at least at the outset,

17   with respect to this being a profile.

18            The first is that that is what the claim

19   language indicates.  That is what is indicated in the

20   prosecution history.  And that's what would be indicated to

21   a person of ordinary skill in the art based on contraceptive

22   science.

23            The second reason is that the remaining terms,

24   the characteristics that are here, have an understood and

25   known meaning to a person of skill in the art.  Each of

1      these characteristics is a known characteristic in the art

2      when assessing a profile for an oral contraceptive.  And

3      each of these terms is a way of characterizing the clinical

4      assessment of whether an oral contraceptive achieves these

5      five characteristics.

6              They make this determination, a person of

7      ordinary skill in the art, based on a comparison to healthy

8      women who aren't otherwise on hormonal contraception.  In

9      essence, that means that when you are testing an oral

10     contraceptive to see what it does, you compare it against a

11     population of healthy women.

12             The last reason is that the comparisons proposed

13     by Warner Chilcott both cannot reasonably be done, meaning a

14     person of ordinary skill in the art cannot reasonably make

15     the comparisons that they are asking, and a person of

16     ordinary skill in the art would not make the comparisons

17     that they are asking.

18             Those are the three reasons that I would like to

19     go through here in greater depth.

20             We discussed that there is a progestin and an

21     estrogen that make up an oral contraceptive.  What does it

22     mean when Bayer says that this whereby clause claims a

23     profile as opposed to a list of seriatim limitations?  Well,

24     it means that the components interact.  It means that high

25     contraceptive reliability, low incidence of follicular

1   development, et cetera, they are interrelated, and you

2   cannot have an instance in which you are the greatest at all

3   of them, because in order to create the profile, tradeoffs

4   have to be made.

5           The five effects that are listed here, the

6   characteristics that are listed here, are identified in the

7   patent as among the three areas of points of emphasis when

8   developing a contraceptive.  These are known points of

9   emphasis in the art when someone, a person of skill in the

10  art, develops an oral contraceptive.

11          I mentioned that there requires balancing.  The

12  regimen itself obviously contains more than just estrogen.

13  But the estrogen component requires making certain

14  tradeoffs.  And this is holding all else constant, and, of

15  course, there is more to it in the claim, but as you

16  increase the estrogen amount, generally, you are going to

17  have better cycle control.  We will go through what cycle

18  control is.  But it is dose-dependent.  You have better

19  cycle control with higher estrogen content.

20          That also includes intracyclic menstrual

21  bleeding.  The higher it is, the better profile you are

22  going to have.

23          Likewise, you are going to have a higher

24  incidence of undesirable side effects, because many of the

25  side effects in an oral contraceptive are related to the

1    estrogen component, and they are dose-dependent.

2              Likewise, when you lower the estrogen amount,

3    you are going to affect the cycle control.  You may have

4    higher incidence of intracyclic bleeding, you may have worse

5    cycle control.  And you are going to have a lower incidence

6    of side effects.  This is the tradeoff that occurs in

7    balancing these characteristics when designing an oral

8    contraceptive.

9              What Bayer claimed was, here it's just

10   indicating the estrogen amount, but a regimen in which there

11   is a low effective estrogen content, low total hormonal

12   content, that produces this profile here.  That is the

13   contraceptive.  That is what is communicated and conveyed in

14   the whereby clause itself:  a set of interacting

15   characteristics that Bayer achieves through the regimen as

16   claimed in the preceding portions.

17             To say that it is not a profile and accept

18   Warner Chilcott's articulation of it would be to take this

19   interactivity apart and to say that you could have a regimen

20   that has the highest contraceptive reliability, the best

21   cycle control, the lowest incidence of intracyclic menstrual

22   bleeding, lowest incidence of side effects than existed in

23   the prior art, you can divorce this interactivity and create

24   a regimen that can function as being the first horse in

25   every race.  We will go through why that is not a plausible

1    reading of the claims to a person of ordinary skill in the

2    art.

3              But what is clear is that in order to get that

4    construction, Warner Chilcott has to show that Bayer

5    disavowed the claim scope.  By claim disavowal here in this

6    context, that means that Bayer said, essentially, that

7    although high contraceptive reliability is there, not

8    highest, that when Bayer wrote high contraceptive

9    reliability it meant that theretofore, before this time, no

10   one had achieved high contraceptive reliability.  That is

11   claim disavowal and has a very strict standard.

12             The case that governs -- I know this Court knows

13   this from the briefs --

14             THE COURT:  Then why go through it, if you know

15   it?

16             MR. FORD:  That's a good point.  Just to point

17   the Court to the standards --

18             THE COURT:  For claim disavowal?

19             MR. FORD:  For claim disavowal.

20             THE COURT:  I am acutely aware of that.  Go on.

21             MR. FORD:  I am happy to move on.

22             THE COURT:  I suggest that you do.

23             MR. FORD:  Thank you.

24             Within the prosecution history, we have the

25   addition of the whereby clause that occurs as part of an

1    amendment over a rejection by two prior art references,

2    Pasquale and Ehrlich.

3            In stating that the whereby clause was novel,

4    the regimen was novel, Bayer did not say that it had

5    achieved for the first time the highest contraceptive

6    reliability or high contraceptive reliability.  What it said

7    was, as set forth in the prosecution history and set forth

8    here, was that it had achieved this profile by using a low

9    effective estrogen content and low total hormonal content as

10   set forth in the regimen, and that these results, there is

11   no suggestion in either of the references here, Pasquale and

12   Ehrlich, that these results could be achieved as set forth

13   in the claim.

14           In their brief, a number of times Warner

15   Chilcott says that Bayer had said we achieved high

16   contraceptive reliability for the first time or satisfactory

17   cycle control for the first time.  That is a misreading of

18   the prosecution history.  The sentence that they are relying

19   on here does say "for the first time," but it's referring

20   to, again, the previous sentence that teaches that no one

21   had taught the use of this amount of estrogen in this

22   regimen in order to achieve the results contained in the

23   whereby clause.  And it says that these results are what

24   have yet to be achieved in the art, not that it has achieved

25   for the first time high contraceptive reliability.

1              Also, in the specification, Bayer does describe

2      disadvantages of the prior art.  Here is one with respect to

3      Mercilon discussed in the briefs.  Here is one with respect

4      to Pasquale, which was in the prosecution history, also

5      discussed in the briefs, noting that there are shortcomings

6      in the art.

7              And here is a section in Column 6 in which the

8      patent discusses the advantages of the regimen but does not

9      say, for example, that although there is a significantly

10     lower frequency of follicular development in the user, that

11     all of the prior regimens have a high incidence of

12     follicular development.  It is not disavowing the scope of

13     what had come before.

14             In addition, if you look here in the prefatory

15     paragraph to this series, it's discussing a number of

16     different regimens, some of which are, generally, 28 days,

17     some of which have seven estrogen days at the beginning of

18     the regimen, some of which have seven placebo days, some of

19     which have 30 micrograms of ethinyl estradiol.  As we saw,

20     because there are dose dependencies here, there is not a

21     single comparison that is made or that could be made with

22     respect to the profile and all that came before it.

23             The Court knows, again, claim disavowal, what I

24     would like to do is point out here a specific example in

25     Ventana Medical Systems case as to why these types of

1    statements aren't enough.  In Ventana, the patent said it

2    was more rapid, more reliable, more reproducible than

3    standard methods.  And the Court said that is not enough.

4    These general statements, without more, that is not enough

5    to get claim disavowal under the patent background here,

6    except that Warner Chilcott is saying we said it was the

7    best.  These are statements that fall short under claim

8    disavowal and would not be sufficient.

9              As a result, because this is a profile, it can't

10   be viewed seriatim as Warner Chilcott proposes.  Instead,

11   you have to view each of these limitations in context, each

12   of them as part of the context of the larger profile.

13             What I would like to do is just move on to

14   Warner Chilcott's proposed construction, and why, if you

15   divorce it from the idea that you are balancing and creating

16   a profile with respective to the contraceptive, why it

17   requires the impossible, because when we have an

18   estrogen-dependent dose that produces different effects for

19   different aspects of the profile, what Warner Chilcott is

20   saying is that we have to produce the highest contraceptive

21   reliability, the best cycle control, the lowest incidence of

22   intracyclic menstrual bleeding, and the lowest incidence of

23   side effects, while using the lowest effective estrogen

24   content.

25             The prior art, as stated in the patent, a person

1    of ordinary skill knows that these regimens contain much

2    more estrogen, for example.  And they know that the dose

3    response is proportionate with respect to these

4    characteristics.  And a person would not read that profile

5    and read this and say that Bayer had claimed to teach the

6    highest or the best or the lowest incidence, when it knows

7    that Bayer is claiming a low effective estrogen content and

8    when it knows that these are generally dose-dependent.

9           This is set forth in fairly succinct language in

10   Warner Chilcott's invalidity contentions, where they say,

11   assume our constructions are correct.  A person of ordinary

12   skill in the art would read that and say, that's impossible,

13   there is no way that you can do this, for the exact reasons

14   we have discussed, because we have other doses of estrogen

15   in the regimens that are higher, 30 micrograms or even 40

16   micrograms.  And because that is impossible, as Warner

17   Chilcott says in its invalidity contentions -- maybe not

18   exactly impossible but unbelievable -- it means that the

19   construction is wrong.  A construction that divorces this

20   from the profile and requires superior performance in every

21   category can't be right, because a person would look at it

22   and say it's impossible given what's in the prior art, based

23   on the comparison of Warner Chilcott.

24           That is with respect to the profile.

25           What I would like to do now, what we have agreed

```
 1    to do now -- correct me if you have a different

 2    understanding -- is go through each individual element and

 3    discuss the constructions here in this whereby clause.

 4              THE COURT:  Yes.  That is what I understand is

 5    proposed.

 6              MR. FORD:  Starting first with "high

 7    contraceptive reliability" here, this slide just sets forth

 8    the dispute.  Really, there are two or perhaps three

 9    disputes.  The first is whether high contraceptive

10    reliability has meaning in the art, whether that is a known

11    term in the art.  The second is whether the Pearl Index is

12    what should be used in order to measure contraceptive

13    reliability for purposes of a comparison to the regimens in

14    the '940 patent.

15              So for the reasons I have just discussed with

16    respect to the whereby clause and viewing it as a profile,

17    we don't think this type of comparison to the prior art

18    regimens is proper because it essentially is claim

19    disavowal.  They haven't met the standard there.  We would

20    also like to go through why in this instance, with respect

21    to contraceptive reliability, it is not the right reading.

22              The intrinsic evidence uses the phrase "high

23    contraceptive reliability," "high contraceptive

24    effectiveness," without any type of definition whatsoever.

25    It is a clinical assessment with respect to the performance
```

1    of a contraceptive.  And there are known methods in the art

2    for measuring the effectiveness of the contraceptive.

3            The extrinsic evidence uses the same type of

4    characterizations when discussing oral contraceptive

5    regimens, saying that they have --

6            THE COURT:  Let me ask both of you, because I

7    see extrinsic evidence on the screen, and I have competing

8    affidavits from physicians, I believe.  Is it your thinking

9    that I need this extrinsic evidence to understand the

10   technology to enable me to perform my task of deciding the

11   disputes?

12           As you both know, I generally don't get into

13   truth-swearing between experts in the extrinsic arena.  At

14   least I won't do it until the next term of the Supreme Court

15   maybe tells us we have a new standard, hopefully, that is

16   going to recognize that trial judges are doing fact-finding

17   and get judged by the "clear error" or some type of

18   standard.

19           That is my rant for the day about the Fed

20   Circuit.

21           I would like an answer.  Why are we going here?

22           MR. FORD:  Can I ask to clarify?  Are you saying

23   extrinsic evidence generally or the expert reports in

24   particular?

25           THE COURT:  Expert reports are part of an

1    extrinsic regime.

2               MR. FORD:  I understand.

3               Our position is that the expert reports

4    themselves are of little use.

5               THE COURT:  What is this?

6               MR. FORD:  This is extrinsic evidence.  These

7    are treatises.  And I understand it's extrinsic evidence.

8               THE COURT:  This is a treatise.

9               MR. FORD:  These are treatises, yes, Your Honor.

10              THE COURT:  I just wasn't sure, given that I had

11   seen affidavits, and, I think, probably in this rather

12   extensive appendix, references to deposition testimony and

13   things of that nature, where we were going with this,

14   because it is not clear from me from looking at the screen

15   the source of this particular slide.

16              MR. FORD:  That is a fair point, Your Honor.

17   For purposes of indicating -- A, these are cited in the

18   brief.  B, these are sourced below each quote.

19              For example, we have the European patent

20   application cited there, an article by Killick on fertility

21   and sterility to the right, and on the bottom right we have

22   an article by Serfaty.

23              THE COURT:  These are peer-reviewed articles?

24               MR. FORD:  The two on the right are

25   peer-reviewed.  The top left is a patent --

1            THE COURT:  We are not talking about treatises.

2    I thought you were going to dictionaries.  Counsel, I need a

3    clear answer to my question.  Where are we going with this

4    extrinsic presentation?  I don't have a clear understanding.

5            MR. FORD:  That is fine.  Our position is the

6    meaning is clear from the text of the claim itself, and that

7    it will be understood by a person of skill in the art.  All

8    this is meant to show --

9            THE COURT:  If you could tell me why I should

10   deviate from the teachings of Vitronics, I will do that.  I

11   give counsel all the time the opportunity to do that.

12   Invariably, you don't.  But if I need this to help me do my

13   job, please, tell me why I need it.  That's all I am saying.

14           MR. FORD:  It is simply meant to provide the

15   context of these --

16           THE COURT:  I don't need context, unless you are

17   helping me understand meaning and thereby giving you meaning

18   and thereby giving the jury meaning.  Otherwise, I am not

19   going waste my time with extrinsic evidence.

20           MR. FORD:  I understand, Your Honor.  To the

21   extent that it is providing -- fair enough.  I understand.

22           THE COURT:  Counsel, I don't mean to hamstring

23   you in your presentation.  If this is a linchpin of what you

24   need to do, go right ahead and do it, and I know how to

25   ignore it if I don't need to use it.  Why don't I let you do

1    what you feel you need to do.  And I will do, back in the

2    confines of my chambers, what I must.  Let's just go.

3              MR. FORD:  I certainly don't want to waste your

4    time.

5              THE COURT:  It's really your time.

6              MR. FORD:  I agree.

7              Before leaving this -- I am not arguing with you

8    as to -- I am explaining what it is, where I am coming from.

9              THE COURT:  I understand.  I have invited you to

10   proceed forward.  Accept the invitation.  Go forward.

11             MR. FORD:  The Court's views are clear, and the

12   intent here is to help to provide meaning to understand what

13   is understood.

14             THE COURT:  I will take it in that spirit.

15             MR. FORD:  Thank you, Your Honor.

16             Again, along the same lines, with the Court's

17   admonition in mind, we have here characterizations of

18   contraceptive efficacy in time.  These are clinical

19   assessments.  A high contraceptive reliability assessment is

20   a clinical assessment made by people of skill in the art

21   with the known methods for assessing clinical reliability

22   and the ability to reach conclusions as to what is high for

23   purposes of contraceptive reliability.

24             That is what is intended to be shown here.

25   Warner Chilcott says itself, Promotes lower estrogen having

1    a high level of effectiveness.  And it says, Clinical

2    development agrees that as far as they are concerned, the

3    FDA's criteria for approval for safety and efficacy is very

4    similar across all contraceptives that are presented.

5           What I would like to do here is briefly address

6    the Pearl Index, which is the portion of Warner Chilcott's

7    construction that they ask the Court to adopt.

8           The Pearl Index is not in the patent.  It's not

9    in the prosecution history.  It's not in the prior art.

10          I would briefly just like to explain what the

11   Pearl Index is so you have a sense of it.  This is just an

12   iconographic example where we have a hundred women.  It is

13   one method of measuring the effectiveness of an oral

14   contraceptive.  We have the measuring of the Pearl Index as

15   the number of pregnancies for a hundred years of women use.

16   What that means is if we have a hundred women studied for

17   ten menstrual cycles with two pregnancies during the cycle

18   indicated here, the Pearl Index would be calculated using

19   this formula, and we get a 2.6 index.

20          The math is not as important as the variables,

21   the information that is contained within the Pearl Index or

22   needed to calculate the Pearl Index.  That is the number of

23   pregnancies, because that is what it measures.  It is the

24   number of women studied, it is the number of cycles studied.

25          None of that information, the Pearl Index is not

 1    in the '940 patent, none of this information is in the '940

 2    patent.

 3              The Pearl Index we don't dispute in the art as a

 4    basis for assessing pregnancy.  There is no dispute there.

 5    It is just not the classical first term, anyway, whether

 6    something is -- there is no numeric value of the Pearl Index

 7    that says high versus not high.  That is not in the art.  In

 8    particular, there is no ability to calculate the Pearl Index

 9    and compare it to what's common in the prior art regimens,

10    because the same information is missing from the prior art.

11              So to the extent that Warner Chilcott's

12    construction asks the person of skill to compare Pearl

13    Indices, the information just isn't there.  Assuming that

14    the information even is there, at the time a person of skill

15    in the art would not do that comparison because you cannot

16    compare Pearl Indices across studies of different clinical

17    studies.  The reason is that there are differences among

18    those studies that make comparison very difficult to do.

19              You can establish comparability.  Generally, it

20    requires assessment.  But what you can't do is say I have

21    Pearl Index A and Pearl Index B, A is greater than B,

22    therefore, B is a better contraceptive.  It is not a type of

23    comparison that can be made.  That was known at the time in

24    terms of how Pearl Indices would be used or not used in this

25    instance.  And that is true today from their own expert, who

1     says that you can't do that type of comparison.

2            Does Your Honor have any questions about high

3     contraceptive reliability?  Otherwise, I can keep trucking.

4            THE COURT:  Keep trucking, please.

5            MR. FORD:  The next term is "satisfactory cycle

6     control" and "intracyclic menstrual bleeding."  I am

7     treating both of these together.

8            As the Court knows, the constructions, Warner

9     Chilcott's proposed construction for both is very similar if

10    not identical.  It makes sense to treat it the same.

11           The first question is whether cycle control

12    means incidence of intracyclic menstrual bleeding or whether

13    it means something else.  The second question is back to our

14    comparison, who do we compare.

15           The specification itself, in terms of the cycle

16    control, is not interested with menstrual bleeding, because

17    although it does say at the beginning here "good cycle

18    control, i.e., low incidence of intracyclic menstrual

19    bleeding," elsewhere it discusses the fact that cycle

20    control includes breakthrough bleeding, which is withdrawal

21    bleeding.

22           I will give the Court some sense of what that

23    means in a few minutes.  But the patent itself does not

24    equate cycle control with intracyclic menstrual bleeding, as

25    is done in Warner Chilcott's proposed construction.

1              "Cycle control" itself is used without any need

2      to further define it apart from what is here.

3              The intrinsic evidence confirms this as well.

4      The two patents, Oettel and Ehrlich, which say here is a

5      perfect cycle control while possibly preventing

6      intermenstrual bleeding, again, that's the same concept,

7      there is a difference between the two.  Here we have Ehrlich

8      saying cycle control, i.e., regular withdrawal menses with

9      optimally few intermenses.

10              What that is saying optimally few intermenses,

11      which is intracyclic menstrual bleeding, with also regular

12      withdrawal menses.  So there are these two components to it

13      as set forth in the intrinsic evidence.

14              THE COURT:  These are some of the deficiencies

15      in the prior art that you are pointing out?

16              MR. FORD:  No.  I am sorry, Your Honor.  We have

17      two pages of prior art that are cited in the patent

18      specification itself.

19              THE COURT:  I guess one of the questions I have

20      is what are the deficiencies in the prior art, as discussed

21      in the prior art?

22              MR. FORD:  The deficiencies in the prior art,

23      there are, generally -- I can put the patent up if you want

24      to take a look at it.

25              THE COURT:  Sure.

1          MR. FORD:  To make it easier, I can go back to

2     the slides to show you.

3          THE COURT:  You can tell you me.  I have the

4     patent in front of me.

5          MR. FORD:  First, you could look at -- there are

6     three general areas.  The first is at 2, from 55 to 67,

7     Column 2.  That discusses an oral contraceptive, Mercilon.

8     And Mercilon was a low-dose oral contraceptive with a 21/7

9     regimen.  And the statement here, the criticism here of this

10    was that the cycle control was somewhat less good than

11    preparations with a higher estrogen dose, and that there was

12    slighter ovarian suppression for a preparation containing 20

13    micrograms of ethinyl estradiol, and that was a clinically

14    important problem.

15         So an identification of a problem isn't

16    necessarily saying that the patent is superior.  But it's an

17    identification of the problem.

18         Also, at Column 3, 25 through 40, there is a

19    discussion of a number of different regimens.  And this

20    includes, I believe it's pronounce "cool," Kuhl, and

21    Pasquale, which is the reference discussed in the

22    prosecution history.  There, these regimens began with a low

23    dose of estrogen.  And the dose of estrogen was not itself

24    sufficient to inhibit ovulation.  So if you start with a low

25    dose of estrogen, there is a risk that the menstrual cycle

1   will kick off at that period of time because there isn't

2   enough hormone to stop it.

3           The criticism here is that in these regimens,

4   follicular development can start to occur in this early

5   period when you have lower doses of estrogen than are set

6   forth.

7           Again, it says that contraceptive protection is

8   thus jeopardized and risk of pregnancy is high, especially

9   in the incidence with the low dose if you have the estrogen

10  first.

11          Again, this is something that was different from

12  the regimen that is claimed here, where you begin with 24

13  days of a combined oral contraceptive pill that is

14  contraceptively effective.

15          Column 6 is where the advantages of the patent

16  are set forth and discussed with respect to regimens, here,

17  the regimens that are in the art.  It states here that --

18  again, we discussed this earlier -- but these are a host of

19  regimens in which a person of skill in the art wouldn't

20  expect, one, a low-dose pill to perform better than, for

21  example, a 30-microgram ethinyl estradiol pill.  We saw that

22  in the earlier slides.  And in Column 6 here we have a

23  discussion of what are called the advantages of this

24  combination.  They are discussed in a very general sense.

25  Nowhere here does the patent say that the patent cures all

1          this, that the patent makes all this go away or that there

2          was anything wrong with the prior art with respect to

3          performance until the regimen came along.

4                    What the patent does is claims a contraceptive

5          profile, as I said earlier, that can be achieved.  It

6          doesn't say it's the only one that has high contraceptive

7          reliability.  But it does.  And it does in the context of

8          having all of these effects, which are as set forth in the

9          patent, parts of the three points of emphasis for a

10         particular development of an oral contraceptive.

11                   THE COURT:  Thank you.

12                   MR. FORD:  Returning to cycle control, this is

13         intrinsic evidence, what I mean by that is patents that are

14         cited on the face of the patent, we have cycle control

15         having a known meaning here.  Again, not something that is

16         defined.  A person of skill in the art knows what cycle

17         control is.  And we discussed earlier that it is broader

18         than just intracyclic menstrual bleeding.

19                   The intrinsic evidence also demonstrates --

20         these are two patents -- that satisfactory cycle control is

21         a known characterization.  These patents have shared

22         inventors with other patents, but these terms are used, and

23         they were never discussed as being unclear or as something

24         that wouldn't be understood by those of skill in the art.

25                   I know the Court gives little weight to it.  But

others use this term.  Others characterize cycle control as

being acceptable.

There are clinical methods for assessing cycle

control.  What it is is measuring the same things we just

discussed, intracyclic menstrual bleeding and the

reliability of the withdrawal bleeding, whether it looks

like the typical menstrual cycle.

People of skill in the art and in extrinsic

evidence, as well as in treatises, are able to say, as well

as in peer-reviewed published literature, are able to

describe cycle control as satisfactory.  It is not a

characterization that causes any type of issue.

To the extent the Court is inclined to rely on

expert testimony, I can discuss this.  To the extent the

Court isn't, I can move on.

THE COURT:  I am really not inclined to rely on

expert testimony, unless you tell me why I should.

MR. FORD:  It is our position you don't.  The

point of these slides, which I will skip, is to show that

there is good reason not to use what Dr. Simon is saying in

his a rebuttal report, as it is inconsistent with what he

said elsewhere.

THE COURT:  For your edification, there is no

one formula for doing this, we all know this.  You are

experienced patent lawyers.  But until there is some word to

1    the firmament in terms of how we review, I have too many

2    cases -- I have colleagues who sit down, and I appear on

3    panels regularly, Stan Chester in New Jersey, and he

4    routinely hears from experts on the witness stand.  I don't

5    have time for that.  He has a lot more fewer cases than I

6    do.  And he enjoys it.  I don't.  Just to help your

7    thinking.

8              MR. FORD:  I absolutely appreciate that.  Our

9    position is you don't need these reports, either.

10             THE COURT:  Then let's move on.

11             MR. FORD:  I will keep trucking.

12             That let's skip a number of slides here.

13             Here we have again, the intrinsic evidence, this

14   is Ehrlich and Oettel, the '242 at the bottom, both of them

15   are cited on the face of the patent.  The discussion here is

16   at, I believe, at 2-6 to 24 in Ehrlich, which states that in

17   this instance, a 21-7 regimen, the seven-day pause has a

18   withdrawal bleeding that simulates the natural menses.  That

19   is the purpose of the withdrawal bleeding, again, simulating

20   the natural menses.  Similar language is contained in the

21   '242 patent.

22             And, of course, as stated in the brief -- but

23   again, the Court may not give much credence to it -- their

24   expert agrees in litigation over this same product.

25             Now, the construction here, moving to

1    intracyclic menstrual bleeding, treating these as the same

2    because we have the same construction by Warner Chilcott, if

3    you look -- really, the only dispute here, both terms use

4    intracyclic menstrual bleeding, the question is whether to

5    add that parenthetical at the end that says, "i.e. any

6    bleeding occurring outside the hormone-free interval."

7            Just very briefly, to explain why that

8    parentheses is wrong, the typical menstrual cycle is

9    punctuated by menstruation.  It is pretty straightforward.

10   When you have a traditional 21/7 regimen, as we saw in the

11   intrinsic evidence, you have a withdrawal bleed that occurs

12   at the end.  And that's not the same as menstruation.  It's

13   just the body's reaction to not having hormone anymore.  But

14   for reasons of more anthropology than anything else, it was

15   meant to confirm that a woman wasn't pregnant and it

16   occurred.  The idea was to create for a 21/7 regimen this

17   withdrawal bleed that mimics natural menstruation.

18           Warner Chilcott's construction says that any

19   bleeding occurring outside the hormone-free interval is

20   intracyclic menstrual bleeding.  That might be fine for a

21   21/7 regimen.  It's not for what we have claimed here,

22   because what you have is, in the specification here at

23   Column 4, 28 through 35, you have a discussion that the

24   combination of having a placebo pill -- two placebo pills

25   and having two low-estrogen-dose pills results in this

1    withdrawal bleeding.

2              So a woman can be bleeding during the two days

3    of estrogen-only pills and not be having intracyclic

4    menstrual bleeding.  So that's why the parentheses that is

5    there and saying that it occurs outside the hormone-free

6    interval is not correct, because you can still have bleeding

7    when you are taking hormones in the estrogen patents.

8              Now, the patent itself, this applies to both

9    cycle control and intracyclic menstrual bleeding, their

10   constructions, the comparison can't be done that they are

11   asking the Court to make.  The rate, for example, they are

12   saying the incidence of intracyclic menstrual bleeding isn't

13   set out in the patent with respect to this regimen.  It's

14   not set out in any of the prior art regimens that would have

15   to be compared.

16             Again, this is extrinsic evidence that the Court

17   will likely ignore, you can't compare cycle controls between

18   two studies.  The same way with the Pearl Indices, you can't

19   compare Pearl Indices.  There is no way to say a study was

20   performed here, has a lower incidence, and I can therefore

21   compare it directly to another person of skill in the art,

22   this is their expert in another case, says you can't do that

23   comparison with data from different clinical studies even if

24   we did have the data available to us.

25             Does the Court have any questions about these

1        terms?

2                    THE COURT:  I do not.

3                    MR. FORD:  Moving to "lower incidence of

4        follicular development."

5                    Follicular development, I know Warner Chilcott

6        reserves the right to say that it is indefinite in a

7        footnote, which we have no issue with.  We just know it's

8        not before the Court on construction.  I say we have no

9        issue.  Of course, we dispute it.

10                    For purposes of construction but not wanting to

11        put words into Warner Chilcott's mouth, we are not asking

12        the Court to construe that term.  The question is whether

13        the comparison is to a population of healthy women or

14        whether it is to every contraceptive regimen in the prior

15        art.

16                    Here in the '940 patent at 7, we have the known

17        methods, two methods for assessing the follicular growth.

18        Those consist of ultrasound, which measure the size of

19        follicles, and the hormone studies, which measure

20        essentially the menstrual cycles, the hormonal fluctuation

21        in the menstrual cycle and whether it is resulting in

22        follicular development.

23                    The patent itself, again, at Column 7, relates

24        the degree of follicular development to the normal menstrual

25        cycle by saying that we have, whether the usual number of 21

1     days to 23 or 24, by moving it above 21, it is a shortening

2     of the pill-free interval, which is when the selection of

3     follicles occurs with conventional combination preparations

4     as in a normal menstrual cycle.

5             So it is relating the follicular development

6     that is occurring here to the normal follicular development

7     that occurs during the menstrual cycle, and also at Column

8     7, saying that follicular development is responsible for

9     breakthrough ovulations.

10            So it is again relating the degree of

11    suppression or inhibition of follicular development to what

12    would occur in a normal menstrual cycle.

13            THE COURT:  Looking at Column 6, I think

14    starting at Line 7, I think Warner Chilcott is arguing that

15    claims like this in the patent and specification support

16    their position on the meaning of this term.  After the

17    colon?

18            MR. FORD:  Column 6, Line 7?

19            THE COURT:  Whatever line it is.  The paragraph

20    that is enumerated 1, Significantly lower frequency of

21    follicular development.

22            MR. FORD:  That's right, Your Honor, yes.

23            THE COURT:  That language is there.  What does

24    it mean in terms of your position vis-a-vis Warner Chilcott

25    and their proposed definition?

1          MR. FORD:  Our position is the term itself is

2     low incidence of follicular development.  That is in the

3     claim.  That would be understood to a person of ordinary

4     skill in the art.  That is our position.  And assessing

5     whether something is a low incidence is something that they

6     are able to do.

7          Looking at the patent and the lines that you

8     pointed out, what it says is that with respect to an

9     unidentified regimen, the patent itself kind of lumps

10    together a number of different regimens in which there would

11    be different amounts of follicular inhibition, depending on

12    the amount of estrogen, lumps them all together; says there

13    that with this regimen that is a lower frequency of

14    follicular development.  What Warner Chilcott says that

15    means is that we claim the lowest, that we are lower than

16    every single regimen that comes before.

17         Our position is that the claim itself does not

18    say lowest.  The claim says "low incidence."

19         The fact that this follicular development may

20    have occurred before doesn't mean that before there was no

21    low incidence of follicular development in prior art

22    regimens.

23         That is the divide vis-a-vis that section right

24    there.

25         Does that answer your question?

1              THE COURT:  Well, let's look at the paragraph.

2        It says, "The advantages of this combination, preparation,"

3        there is a parenthetic, "(according to the invention) that

4        is administered generally over 28 days compared to

5        previously described preparations," then it goes on to list

6        the advantages.  One is a "significantly lower frequency of

7        follicular development."

8              Warner Chilcott proposes, defendant proposes a

9        lesser incidence of follicular development than the

10       incidence of follicular development contained in the prior

11       art.

12             Maybe that is the difficulty we have, "contained

13       in the prior art."

14             MR. FORD:  Exactly.  That paragraph, it is

15       dose-dependent.  You have a number of different regimens

16       that are lumped in here together, some of which have much

17       higher amounts of estrogen than does the claim regimen.  And

18       a person of skill is not going to look at that and say that

19       something that is stated in the claim, we would say even

20       should be lower, 15 micrograms or less than 20, is going to

21       achieve a great improvement in follicular development over

22       30 or even 40-microgram estrogen development.  In

23       particular, in the discussion of follicular development here

24       in the patent, when it is stated more explicitly with

25       respect to prior regimens, it concerns Pasquale and regimens

1       that begin with low doses of estrogen and go on and allow

2       for follicular development to occur right at the outset.

3       And so one issue with just saying that each and every prior

4       art regimen is these are very different regimens that are

5       going to have very different profiles.  And a person of

6       skill in the art is not going to look at this and think that

7       it is better in every way than all these very different

8       regimens, because they have different impacts.  They have

9       different estrogen doses, different impacts.

10              THE COURT:  Okay.

11              MR. FORD:  And a person of skill in the art,

12      again, would have a method using the same methods that are

13      set forth in the patent itself, this measurement of

14      follicular development as well as the hormone levels that

15      occur, the ability to conduct clinical studies and to

16      evaluate the degree of follicular growth and to assess it,

17      to make the exact same assessment that is here, low

18      incidence of follicular development, using the same methods

19      that are set forth in comparison to the normal menstrual

20      cycle and the amount of the follicular growth that occurs

21      while taking the contraceptive versus what would happen

22      without the contraceptive.

23              Again, based on what's in the Warner Chilcott

24      proposed construction, another issue that we want to flag

25      for the Court is that the comparison again cannot be made

1    that they ask, cannot reasonably be made.  The incidence of

2    follicular development is again not in the patent.  There is

3    no set forth incidence.  The incidence of follicular

4    development is not set forth in the prior art.

5           There is no basis for saying that a person of

6    skill in the art could just look at the patent and look at

7    the prior art and therefore know one is greater than the

8    other without conducting clinical trials comparing the two.

9           The data just isn't there to make the comparison

10    that they want.  Whereas there are known methods in the art

11    as described in the patent for assessing follicular

12    development.

13           Moving on to side effects.

14           Again, setting up the dispute for the Court, we

15    don't ask, subject to any clarification of Warner Chilcott,

16    we don't ask the Court to construe "undesirable side

17    effects."  The question is whether the comparison should be

18    between a healthy woman or should be all prior art regimens.

19    That is the issue again.

20           It is stated in the patent, a point of emphasis

21    again is to minimize undesirable side effects.

22           The side effects occurring generally in oral

23    contraceptives, I think of them in two different categories.

24    One is a side effect from taking a pill that comes from

25    having estrogen in your system.  Those side effects tend to

1    mimic pre-menstrual syndrome because during pre-menstrual

2    syndrome a woman has free-floating estrogen in her body and

3    that has side effects.  And one of the advantages of oral

4    contraceptives, especially low-dose oral contraceptives, is

5    that you can get much less estrogen, a woman has less

6    estrogen floating in her body, and therefore those

7    estrogen-related side effects are lower.

8              This is set forth in Column 6, Line 33 to 38,

9    where the combination dosage set forth here improves cyclic

10   control, lowering incidence of side effects, such as

11   headaches, within the framework of the pre-menstrual

12   syndrome.  That is discussing, again, these types of

13   estrogen-related side effects.

14             Above that we have a discussion from Column 1

15   where a particular type of side effect associated with side

16   effects and estrogen is listed, and that is cardiovascular

17   disease.  Again, the person of skill in the art, when they

18   are conducting these types of studies, evaluating whether

19   there is an amount of side effects, they are going to

20   compare that to the baseline.

21             Bayer's position is not that a woman that is not

22   taking hormonal contraceptive has side effects.  Bayer's

23   position is simply that if you are assessing the side

24   effects, assessing the profile of a contraceptive, you are

25   going to examine that based on what it is the contraceptive

1     is doing in light of what would happen if you didn't take

2     the contraceptive.  This is known in the art.  This is how

3     studies are done, comparing and assessing the degree of

4     extrinsic evidence.  There are studies cited in the briefs

5     that you can look at.

6                    Again, going back to the comparison Warner

7     Chilcott asked the Court to make -- again, we are on the

8     same issue -- where this data does not appear in the patent

9     itself, although side effects appear, those of skill in the

10    art are able to assess them.  There is no data in the patent

11    and there is no data in the prior art with respect to the

12    incidence of side effects that would be compared.

13                   In fact, again, Lo Loestrin's own labeling from

14    today says you can't compare incidence of side effects

15    across different clinical studies, which is the same

16    comparison which they are asking the Court to make here.

17                   Any questions with respect to that limitation?

18                   THE COURT:  No.

19                   MR. FORD:  Okay.

20                   Your Honor, we have discussed what I have called

21    the direct object here in the whereby clause, we have gone

22    from the first to the last.

23                   What I would like to discuss is the "low

24    effective estrogen content," which is part of the whereby

25    clause, although we are treating it separately here.

1              Up here is just a graphical depiction of the

2      parties' proposed constructions.

3              Bayer's construction is that it is a daily dose

4      of estrogen equivalent to no more than 40 micrograms of

5      ethinyl estradiol.  So it has estrogen content but it is

6      less than 40 micrograms.

7              Warner Chilcott's construction differs depending

8      on whether it is the combined pill, which is the first

9      hormone component identified in the claim, or whether it is

10     the second pill, which is the estrogen-only component of the

11     claim.

12             And the difference is that Warner Chilcott

13     allows for much less in the estrogen-only pill,

14     two micrograms/15.

15             THE COURT:  Would less than 15 be effective?

16             MR. FORD:  Yes.  Our position is that, yes, it

17     would be.

18             The patent itself states that low effective

19     estrogen content applies to both that term as it is used in

20     the patent right there in the claim, applies to both sets of

21     pills.  And the abstract says that you want estrogen content

22     that is as low as possible in each individual dosage unit.

23     And estrogen content is in two different places here, one in

24     the abstract and one at Column 3.

25             THE COURT:  In the context of this term, the

1    word "effective" means what?

2              MR. FORD:  In the context of this term, the word

3    effective, in our opinion, the patent itself sets forth a

4    number of different estrogens.  This is an estrogen

5    agnostic, this claim.  So in order to determine the content

6    of the estrogen, it's looking at the effective estrogen

7    content across the identified estrogens, the synthetic

8    estrogens there.

9              The low effective estrogen content again applies

10   to both.  This is Claim 9, which is not at issue but is

11   useful in understanding the context in Claim 1, where both

12   the combined pill has a low effective estrogen content that

13   is set forth and the estrogen-only pill has a low effective

14   estrogen content that is set forth there.  This is a term

15   again that applies to both of these.

16             The object of the invention -- this is as Column

17   3, 41 through 43 -- is to have the estrogen content that is

18   as low as possible in each daily dosage unit.  The patent is

19   teaching a person of ordinary skill in the art to use as low

20   as possible an amount of estrogen in each daily dosage unit.

21             The Pasquale patent, again, which is intrinsic

22   evidence, describes 35 micrograms of ethinyl estradiol as

23   being a low dose.  The patent itself, at Column 2, 61

24   through 67, says that 20 micrograms is a very low dose.

25             The patent itself then, in both the

1    specification and in the claims, teaches to use even less

2    than that.  It says that 20 micrograms is a very low dose,

3    it says using even less than that in terms of the amounts

4    that are identified and claimed here in Claim 9, but also

5    with respect to the effective estrogen content in the

6    estrogen-only pills.

7            So we have a teaching in the patent, use as low

8    an effective estrogen dose, use as low a dose as possible.

9    The same is saying that 20 micrograms is low, and saying use

10   even less than that.

11           Those are the teachings.  None of those

12   limitations are in this claim, which just says low effective

13   estrogen content.

14           Now, the problem with Warner Chilcott's proposed

15   construction is that it is essentially limitless.  It starts

16   but it doesn't end.  The intrinsic evidence says, the Spona

17   '129 patent teaches that the march of history has been to

18   lower the amount of estrogen content in oral contraceptives.

19   Warner Chilcott's proposed construction goes up again very

20   high.

21           And at the time of the patent itself, there was

22   no marketed oral contraceptive with more than 50 micrograms

23   of ethinyl estradiol, and at least in the opinion of some --

24   again, this is extrinsic -- that most people should be

25   taking much less than that.

```
 1                   So the issue that ultimately, in our opinion,
 2       undermines Warner Chilcott's proposed construction is one of
 3       claim differentiation.  If there is any difference, Claim 4
 4       of the patent, for example, claims an amount of ethinyl
 5       estradiol in the estrogen-only pill as being between 2 and
 6       40 micrograms.  And under Bayer's construction there is a
 7       difference between effective estrogen content in Claim 1 and
 8       the effective estrogen content in Claim 4, because you can
 9       have less than 2, you can have, for example, 1 microgram.
10       With their proposed construction, there is no difference
11       between Claim 4 and Claim 1 unless you use a higher amount
12       of estrogen, you use an amount of estrogen that approaches
13       or exceeds the highest amount that has been used in a
14       marketed contraceptive at the time of the invention.
15                   The Court has indicated that you are not
16       considering Dr. Simon, the expert testimony particularly
17       helpful.  But, regardless, allowing there to be a -- because
18       of Claim 4 and the limitations in Claim 4, in order for it
19       to have a difference from Claim 1, you have to go to a much
20       higher estrogen amount.  That contradicts the patent's
21       teaching to use as low as possible in each amount.  It is
22       greater than the amount that we are characterizing as low in
23       the intrinsic evidence, very low in the patent itself.  And
24       it is inconsistent with the intrinsic evidence that the
25       march of history describes with regard to the amount of
```

1   estrogen.

2               That is the effective estrogen content.  That is

3   everything in the whereby clause.

4               There is one more claim, which is "between these

5   two hormone components," which is right here.

6               Bayer's position is essentially this term

7   doesn't need construction.  There is a third hormone

8   component in the claim.  There is a second hormone component

9   in the claim.  And then it says between these two hormone

10  components.

11              It is pretty straightforward.  It would be clear

12  to anyone, a jury, a layperson, to understand identifying

13  two hormone components and saying between.  We have offered

14  a construction we think is more straightforward.  But we

15  don't think that this term needs construction at all.

16              THE COURT:  Does the specification ever teach

17  that the second hormone component contains anything other

18  than estrogen?

19              MR. FORD:  You are saying the second hormone

20  component?

21              THE COURT:  Yes.

22              MR. FORD:  No.  The second is defined as

23  consisting essentially of an estrogen.

24              THE COURT:  Okay.

25              MR. FORD:  Thank you, Your Honor.

1                    THE COURT:  Thank you, counsel.

2                    MR. SONNENSCHEIN:  Good morning, Your Honor.

3      Eric Sonnenschein for Warner Chilcott.

4                    THE COURT:  Good afternoon, Mr. Sonnenschein.

5                    MR. SONNENSCHEIN:  I am going to be following

6      the order that Bayer did, with one minor exception.  I am

7      going to reverse the very last two terms.

8                    In obtaining the '940 patent, the applicants had

9      to overcome an obviousness rejection.  The way that they did

10     that was to add to the claims of the '940 patent the five

11     terms that are listed up on the screen and argue that those

12     terms constituted superior results that distinguished their

13     oral contraceptive from the prior art.

14                   That's how they got the patent.  And that's a

15     critical fact that Your Honor should keep in mind when

16     assessing the meaning of these terms.

17                   THE COURT:  Counsel, it would help if you talked

18     to me rather than the screen.  That should be innate, not

19     your principal means of advocacy.  You are an advocate,

20     please.

21                   MR. SONNENSCHEIN:  Sure.

22                   Another critical principle that the Court should

23     keep in mind when evaluating the meaning of these terms is

24     that claim terms need to have a definite meaning, and

25     constructions of claim terms need to have a definite

1    meaning.  For constructions to have that, there needs to be

2    an objective way to assess whether an accused product falls

3    within the scope of the claims or not.

4              It is the Warner Chilcott constructions that

5    adhere to those principles, not the Bayer principles.

6              As they said, we are going to follow the agenda,

7    with the minor exception that we are reversing these last

8    two terms.

9              So we will start with the whereby clause as

10    well, as Bayer did, and with the set of five terms that

11    appear within that whereby clause.

12              Just as an initial matter, we think of these

13    terms as five separate terms, "high contraceptive

14    reliability," "low incidence of follicular development," and

15    so forth.  Bayer argues that this is a single term.  But

16    these are distinct requirements.  They cover different

17    concepts.  And they are stated in the conjunctive, meaning

18    that each has to be satisfied.  So we don't think it is a

19    serious argument that this is only one term.

20              Nonetheless, while these are individual terms, I

21    thought I would start with a general discussion of this set

22    of terms, because we believe that the approach that Your

23    Honor should take is the same general analytical approach in

24    deciding all of these.

25              So as in any claim construction, Your Honor

knows that we start with the language itself.  As Your Honor

will see, each of these terms contains imprecise language,

vague language, "high," "low," "satisfactory," "reliable."

These are nowhere close on their own to adequately delineate

the scope of the claims.

So we need to go further to figure out whether

there is a definite scope to these claims.  When Your Honor

does that, we would recommend considering a question that

Bayer asks in its opening brief and paraphrased up on the

screen, the question is:  Did Bayer purport to invent an

oral contraceptive with a low dose of estrogen that was

superior to every prior art oral contraceptive regimen

identified in the '940 patent along several different

characteristics?

The prosecution history answers that question

yes.

I am just going to preview this now.  We will

come to this in more depth in a little while.  They

contrasted the deficiencies of the prior art with the

superior results of their regimen.  And they went on to

enumerate what those advantages were.  And as Your Honor can

see, they enumerated five advantages.  And Your Honor will

note that these are the very claim terms that Your Honor has

to construe.  They are equating the terms with superior

results.

1           And they go on later -- and we will look at this

2    in greater depth in a little while -- but they go on to say

3    that their regimen provides these results for the first time

4    in a low-dose regimen.  If the prior art had already

5    provided those, it wouldn't have made sense to say that they

6    were providing those effects for the first time.

7           Now, the specification also says yes.  And Your

8    Honor has already looked at this.  But to go through, just

9    to recap this, this points out that there are several

10   advantages to their claimed combination preparation compared

11   to the previously described preparations.  And this goes on

12   without limitation, without saying that one or more of these

13   advantages may apply; but, rather, giving a blanket

14   statement, an unqualified statement of superiority, that

15   there were several advantages, lower incidence of follicular

16   development, greater contraceptive reliability, lower

17   incidence of side effects, and better cycle control.

18          These characteristics line up precisely with the

19   characteristics that were claimed as part of the claims of

20   the '940 patent.

21          So what really happened here?  Well, what really

22   happened here was that the applicants drafted their patent.

23   They applied to the Patent Office for a patent.  They got a

24   rejection, an obviousness rejection.  And essentially what

25   they did was, to overcome that rejection, claimed these

1    results, claimed these superior results, said, we are better

2    than the prior art and we are better than the prior art in

3    these ways.

4              So when Your Honor is thinking about how do I

5    construe these vague terms, what standard do I use, we are

6    proposing to use the standard that they were using, one of

7    superior performance, superior performance over the prior

8    art.

9              And, not to belabor this, but there are two

10   principles that support this approach.  One is the Datamize

11   principle.  When you have a word of degree or subjective

12   phrase, the Court needs to look to the patent specification

13   or prosecution history for an objective standard.  If you

14   don't have that, we don't have a definite meaning.

15             The only one that is suggested here is this

16   standard of superiority.  How do you know that you have

17   these claim characteristics?  If you are better than the

18   prior art.  That is the standard that was used in the

19   prosecution history.  That is the standard that should apply

20   here.

21             A second principle that supports this approach

22   is disavowal, which Your Honor knows that.  But critically,

23   one way of clearly disavowing claim scope is to clearly

24   characterize the invention in a way to try to overcome

25   rejections based on prior art.  That is exactly what

1    happened here.  They added these terms to overcome a

2    rejection based on prior art, saying it's these

3    characteristics that distinguish our regimen from the prior

4    art.

5              Now, Bayer makes a series of arguments about why

6    these should not individually be construed to require

7    superior performance.  In their brief, and here today, they

8    say they weren't claiming a combination of superior results.

9    Well, let's look at the claim language and compare that to

10   the prosecution history.  It's very clear that they were

11   claiming superior results, not results that the prior art

12   had already achieved.

13             Your Honor sees that just by lining up the

14   language in the claims with the language that they

15   identified as superior results.  They are verbatim.

16             The second argument that Bayer makes for why we

17   shouldn't construe each of these to require superior

18   performance is this notion that it would be scientifically

19   impossible to achieve multiple superior results.  Well,

20   that's completely contradicted, and contradictory to what

21   Bayer said in its patent.  It was more than happy when it

22   was applying for the patent to talk about all of these

23   advantages without limitation, to say that they were better

24   in all of these ways and to claim superior performance as a

25   basis for distinguishing their regimen from the prior art.

1              So what this amounts to is trying to have these

2       things both ways, in prosecution, tout all of these multiple

3       advantages, and then turn around and try to have a different

4       claim scope now that we are in litigation.

5              Patent claims are not a nose of wax.  And the

6       law has been long clear that the scope of a claim in

7       prosecution is the scope of the claim in litigation.

8              Just one other point, sorry.

9              They make the point that as you lower estrogen

10      cycle control generally declines.  And that is true.  But

11      opposing counsel noted that that is all else equal.  If you

12      keep everything the same, and you lower estrogen, then the

13      result would have been that cycle control would be worse.

14      If you made other changes, that categorical rule may or may

15      not have applied.  It probably would have applied, but

16      possibly not.  It wouldn't have been scientifically

17      impossible.  And they didn't say that it was scientifically

18      impossible.  They said that their regimen outperformed the

19      prior art that they described in their patent, and they said

20      that they had better cycle control, and the reason that they

21      had better cycle control is that they didn't just hold the

22      prior art constant and lower estrogen dose.  They introduced

23      a different administration scheme that they said allowed

24      them to achieve unexpected results.  Innovation sometimes

25      has unexpected results.

1                 The final argument that I mentioned before is --
2         while we are on the subject, I just wanted to, I think this
3         is a good place to address the argument.
4                 There are a number of arguments that they have
5         made that you couldn't test, it would be impossible to know
6         whether this would be better than these other patents.
7         Well, certainly, they had a way of doing it.  How would you
8         know whether you were better than the prior art unless you
9         tested it?  And certainly, there would be a way to do that.
10        We are not saying that you would just eyeball these and ask
11        whether you were better or not.  You would test the
12        regimens.  You would test embodiments of the patent.  And
13        that's how you would know.
14                A brief point, these are distinct terms.  Each
15        is a requirement.  These cover distinct concepts.  You can
16        have high contraceptive reliability, for example, but not
17        avoid undesirable side effects.  This would be very
18        different language if some of these were not present.  And
19        they are connected with conjunctive terms.  Each is a
20        requirement.
21                It's not clear what Bayer is proposing, if this
22        is one term, how an infringement analysis would proceed.  Is
23        each of these going to have to be satisfied for an
24        infringement analysis?  It is unclear what they are even
25        proposing with that.

1          This idea that this is all one combination of

2     characteristics doesn't tell us, if each of these does not

3     require superior performance, it doesn't tell us how good

4     each of these characteristics needs to be.  It is easy to

5     say we came up with a combination, we balanced things.  It

6     is another thing to point out exactly how that balance

7     worked.  There is no discussion of that in the intrinsic

8     evidence.  It is, as we pointed out, an unabashed,

9     unequivocal statement of superiority.

10          I am now ready to talk about the individual

11    claim terms.  Let's start with "high contraceptive

12    reliability."

13          Consistent with the standard of superiority that

14    we have been talking about, when we are thinking about these

15    vague terms and how to come up with a more precise standard,

16    Warner Chilcott is proposing that this term be construed to

17    mean contraceptive efficacy measured using the Pearl Index,

18    greater than that of each and every prior art oral

19    contraceptive identified in the '940 patent's specification.

20          Bayer, on the other hand, simply repeats the

21    disputed language, which is not helpful, and then they tack

22    on this "as compared to" language, as compared to a

23    population of healthy women not using hormonal birth

24    control, that is not anywhere in the intrinsic evidence.  We

25    will talk about that later.  But it is not clear what that

1   even means or how that would advance the infringement

2   analysis.

3              The real issue before Your Honor is what does

4   "high" mean.  How high does this contraceptive reliability

5   have to be?  This is an imprecise term, it is a term of

6   degree, so different people could mean different things when

7   they talk about what high contraceptive reliability means.

8              Just in lay terms, someone might call a

9   basketball hoop high, another person might call a mountain

10  high.  It doesn't mean they are the same height.

11             And high requires a comparison to some standard.

12  How high?  High as compared to what?  Is the tallest

13  building in Wilmington high?  If our standard is a

14  three-story townhouse, yes.  But if it is the Empire State

15  Building, no.

16             This is precisely why under the Datamize

17  principle, we need to look at the intrinsic evidence for a

18  standard.  And that is where the prosecution history and

19  standard come in.

20             I am just going to go through this a little bit

21  more carefully for Your Honor.

22             So there was initially a rejection, an

23  obviousness rejection Your Honor has heard about, based on

24  the Ehrlich and Pasquale references.  In response, the

25  applicants amended their claims.  The way that they amended

1      their claims to overcome that obviousness rejection was to

2      add the underlined language here in the whereby clause.

3      That incorporates this set of terms that we are talking

4      about, including high contraceptive reliability and the

5      other terms.

6                  Then on Page 5 is where they explained what they

7      were doing.  They talk about the fact that these claims are

8      obvious over the Ehrlich and Pasquale combination, briefly

9      describe what those references disclose.  Then they go on to

10     talk about how their regimen contrasts with the deficiencies

11     of the prior art multiphasic combination preparations

12     discussed in the specification.  And they talk about what

13     those distinguishing characteristics are.  One of those is

14     high contraceptive reliability.  High contraceptive

15     reliability there is being used to mean a degree that

16     contrasts a degree of reliability, that contrasts their

17     regimen with the prior art.

18                  What were the deficiencies?

19                  Column 6 enumerates some of the deficiencies and

20     explains how their regimen addresses the deficiencies.  It

21     lines up with these terms here.

22                  In the last sentence, which opposing counsel

23     looked at as well, they give an example of a couple of

24     references that lacked these five results.

25                  There is no suggestion in either of the

1    references -- there they are referring back to Ehrlich and

2    Pasquale, and they are saying, there is no suggestion that

3    you could get these results in those.

4              What is that saying?  These results, 1, 2, 3, 4,

5    5, are lacking.  Then they didn't stop there.  They said

6    there is no teaching in the cited prior art, all of it,

7    whereby the low effective estrogen content and low total

8    hormone content provides the five, the set of

9    characteristics that we are talking about here, one of them

10   being high contraceptive reliability.

11             They go on to say that their regimen provided in

12   a low-dose regimen these characteristics for the first time.

13   Each of these is a superior result.  They supplied each of

14   these.  These are characteristics the prior art lacked.

15             And if there were any question, what did they

16   say in their specification?  They said that they had greater

17   contraceptive reliability than all of them.  What does high

18   contraceptive reliability mean here?  It means a standard

19   that outperforms the prior art.

20             It was precisely this addition, this amendment,

21   that allowed them to get the patent.  That's how they

22   distinguished.

23             What does Bayer say?  They are not entirely

24   clear.  But they suggest that combination of oral

25   contraceptives, all of them have this.  This is from the Dr.

1        Shulman declaration.  But there are other suggestions in

2        their briefing.  What is wrong?  Then they argue, also, that

3        Ehrlich and Pasquale, which we were just talking about, have

4        high contraceptive reliability.  What is wrong with those

5        arguments?

6                It is fundamentally inconsistent with the

7        prosecution history.

8                If all oral contraceptives have high

9        contraceptive reliability already, it would have made no

10       sense for them to call this a superior result.  All oral

11       contraceptives would already have this.  It wouldn't make

12       sense to list it as a superior result.

13               What is happening here?

14               Essentially, Bayer is trying to rewrite the

15       prosecution history to read out this superior result.

16               And the same thing goes for the whereby clause.

17       If all oral contraceptives had this standard, it would have

18       made no sense to include that as a distinguishing

19       characteristic.  Implicitly, all of them would have it.  You

20       wouldn't need to list that.  It would be redundant.

21               And Bayer's argument that Ehrlich and Pasquale

22       already had high contraceptive reliability is again

23       inconsistent with the prosecution history.

24               We talked before about what this last sentence

25       is saying.  It is saying that there is no suggestion in

1       either of these references -- and I am talking there about

2       the last sentence -- that these results, plural, this set of

3       results that they referred to earlier, including high

4       contraceptive reliability, no suggestion of those results.

5                    Well, in saying that Ehrlich and Pasquale had

6       this, they are again essentially rewriting the prosecution

7       history to say, what would that prosecution have looked like

8       if those had high contraceptive reliability under the

9       standard?  It would have been written to say, well, Ehrlich

10      and Pasquale each had high contraceptive reliability.  There

11      is no --

12                   THE COURT:  I need to pause for a moment,

13      please.

14                   (Brief recess.)

15                   THE COURT:  Thank you.  Sorry.

16                   MR. SONNENSCHEIN:  They wouldn't have written

17      this the way they did if Ehrlich and Pasquale had.  They

18      would have written this to say, while Ehrlich and Pasquale

19      each had high contraceptive reliability, there is no

20      suggestion in either of these references that these other

21      results -- these other results -- would have been present.

22      They didn't say that.

23                   It was a sweeping statement.

24                   One argument that I will quickly pass over

25      because they didn't raise it here, but they do hint at it in

1      their briefing, is that somehow Ehrlich and Pasquale can be

2      distinguished on the basis of dose.  But they are all

3      low-dose regimens.

4                  Let's talk about the Bayer construction.  "High

5      contraceptive reliability as compared to a population of

6      healthy women not using hormonal birth control."  What is

7      the first problem with this?

8                  This phrase is not present, is not suggested, in

9      the intrinsic evidence.  This is something that the lawyers

10     have made up to distract from what the real comparison was,

11     which was the prior art here.  And there is no

12     acknowledgment in this construction of the fundamental fact

13     that this term was added to overcome an obviousness

14     rejection and to distinguish this as superior.

15                 Under the way that they approach it, one would

16     never know about this prosecution history, that this term

17     has to mean better than the prior art at least in some way.

18                 And who is this population of women that they

19     are proposing?  They just tell us, a healthy population of

20     women not using hormonal birth control.  They don't tell us

21     if they are using any birth control, and if so, what kind?

22     Clearly, there is a difference in pregnancy risk for a group

23     of women who are using some form of contraception as opposed

24     to no contraception at all.

25                 And there is no discussion here about other

1    characteristics.  For example, what are the ages?  What is

2    the fertility of these women?  How sexually active are they?

3    These all affect the question of what that comparison would

4    entail.

5              More fundamentally, there is no objective

6    standard here.  Compare it a population of women, okay,

7    let's do that.  How?  How reliable does this have to be if

8    we compare it to a population of women?  This just does not

9    answer the question.

10             The best that they can do is, in their reply

11   brief, just say that an oral contraceptive has high

12   contraceptive reliability when the pregnancy rate is low

13   when using the contraceptive when compared to healthy women

14   who are not using hormonal contraception.

15             That just begs the question, how low?  What is

16   the cutoff?

17             Just to note this point, which Your Honor is

18   aware of, but ordinary meaning won't cut it when ordinary

19   meaning doesn't resolve disputes about claim scope.

20             So to the extent this has an ordinary meaning,

21   it's not enough.  We need greater clarity.  The standard

22   here, if there is any, is the prior art.  And if that is not

23   the standard, then there is no standard, and we are dealing

24   with an indefinite claim.

25             The last part of this is our construction

1    measured using the Pearl Index.  We need to have some way of

2    measuring the contraceptive reliability.  So how do we do

3    that?  We use the standard at the time of the invention.

4    And the standard at the time of the invention was the Pearl

5    Index.  If we don't use that, what measure do we use?  And

6    Bayer doesn't propose.  They just say, this can't work, but

7    they don't tell us which one does.  So how would we even

8    conduct the infringement analysis when we get down the road?

9            The Honeywell case that we cite makes the point

10   that when you have multiple potential tests and they could

11   potentially generate different conclusions about

12   infringement, that's indefinite.  We need, for an objective

13   standard, we need a standard.  We are proposing the Pearl

14   Index.  Is it perfect?  It's not perfect.  But would that

15   have been the standard?  It would have been the standard.

16           What is Bayer's primary problem with it?  They

17   say you can't compare two contraceptives using the Pearl

18   Index.  The prior art did compare using the Pearl Index.

19   Just very briefly, two examples in the extrinsic evidence,

20   The Akfhlund study, this compared the reliability of two

21   regimens using the Pearl Index.  The Corson study used the

22   Pearl Index to compare multiple regimens.

23           The problem that Bayer points to is the idea

24   that if you use the Pearl Index but you don't compare

25   different oral contraceptives over the same length of time,

1     then that can create distortions.  We are not proposing that

2     these be compared over different lengths of time.  One would

3     compare over the same length of time.  And one would do it

4     in a clinical trial.

5              We are not saying you wouldn't test it.  You

6     would test it.

7              Let's turn to the next term.  "Low instance of

8     follicular development."  This is in approach fundamentally

9     the same as "high contraceptive reliability."  We have a

10    term, "low," a term of degree.  We need an objective

11    standard.  What is the objective standard?  We have looked

12    to the intrinsic evidence.  What is the only objective

13    standard that is suggested?  Again, it's the prior art,

14    better than the prior art.

15             What does low mean in this context?  If it means

16    anything, it means better than the prior art.

17             Consistent with that approach, Warner Chilcott

18    proposes:  A lesser incidence of follicular development than

19    the incidence with each of the prior art regimens identified

20    in the '940 patent.

21             Bayer, in approach, again, they use the same

22    fundamental approach, repeat the language and tack on "as

23    compared to" language.

24             Very briefly, I just wanted to talk about

25    "follicular development" and "incidence" before we get to

1    "low."

2            What is follicular development?  Well, women

3    become pregnant by producing an egg.  In that event -- the

4    fancy term for it is ovulation.  When the woman produces the

5    egg, it travels through the fallopian tube.  And if sperm is

6    there to fertilize the egg, conception will occur.  There

7    will be implantation of that fertilized egg in the wall of

8    the uterus and a pregnancy will result.

9            How is an egg produced?

10           Tiny structures in the ovary called follicles

11   grow to the point where one gets so big that it bursts and

12   an egg is released.  That is what this is showing, that

13   process of growth.

14           This is another illustration of that phenomenon.

15           As Your Honor can see, follicular development is

16   a process.  It occurs along a continuum.  So at some point,

17   when we are talking about what is an incident of follicular

18   development, there is a line-drawing problem.  How far along

19   this continuum does that follicle need to have grown for

20   there to be an incident?

21           What does the patent mean by incidence of

22   follicular development?  It's talking about frequency.  How

23   often is this occurring?  And we see that, for example, in

24   Column 6, Lines 9 through 19, where they are talking about

25   how their regimen compares to the prior art.  And they are

1      saying that there is a lower frequency of follicular

2      development.  What do they mean by that?  A lower incidence.

3              How could one go about figuring out what an

4      incidence of follicular development is?  We just wanted to

5      illustrate one possible way so that Your Honor has the

6      benefit of this.  This explanation is not laid out in the

7      '940 patent but it is laid out in the '129, which is cited

8      in the patent.

9              So in this Figure 2, Your Honor will see that

10     what these inventors did was to say -- to look at the

11     percentage of females with follicular maturation -- by that

12     presumably they meant follicular development, that is a

13     synonym -- and in terms of talking about incidence, they are

14     just talking about how many women, what percentage of women

15     had this.

16             In this example, they are comparing the

17     percentage of women or the incidence of women on two

18     different oral contraceptives, a 21-day and a 23-day.  What

19     was the incidence here?  For the 21-day in Cycle 1 it was 20

20     percent.  For the 23-day, it was ten percent.

21             And then Your Honor can see different numbers

22     for the different cycles.

23             And if Your Honor recalls, this is a continuum

24     of growth, how far along are we to determine at what point

25     there is an incident.  In this instance, they defined what

1   follicular development was.  They said greater than 13

2   millimeters.  They gave a standard.  There is no standard in

3   the '940 patent.

4            But in any event, the fundamental question comes

5   down to what is meant by low.  And at this point the

6   analysis parallels what we talked about with high.  We need

7   an objective standard, and we look to the intrinsic

8   evidence, the prosecution history.  I can go through this

9   again.  But low incidence was added to overcome an

10  obviousness rejection.  It was one of the superior results,

11  and so forth.

12           And if there is any question of what they were

13  saying -- okay.  What's wrong with the Bayer construction?

14  Well, it's the same fundamental problems that we talked

15  about before.  No basis for adding this.  Fundamental lack

16  of recognition about the context in which this term was

17  added, superiority, they meant superiority.  Not comparing

18  it to a population of women that are not using hormonal

19  birth control.

20           The only flaw that I wanted to focus on a little

21  bit more was the fact that this is not a helpful standard.

22  It is an ambiguous standard.

23           To start, while Bayer proposes in its

24  construction -- let me just back up -- they are talking

25  about low incidence as compared to a population of healthy

1    women not using hormonal birth control.  In their brief,

2    they change that standard.  And now, rather than as compared

3    to a population of women not using hormonal birth control,

4    they are talking about the normal menstrual cycle.  You see

5    that here at Page 15 of their opening brief.

6              What is this normal menstrual cycle?  Is this an

7    eight-year-old's menstrual cycle?  Is this a 30-year-old's?

8    That would presumably affect the analysis.

9              What we are assuming is by normal they mean

10   ideal.  And by ideal we are talking about a cycle in which

11   ovulation occurred.  As we looked at before, for ovulation

12   to occur, you need to have follicular development, however

13   that is defined, because there is no egg if the follicle

14   doesn't develop.  We are assuming a hundred percent.  It

15   doesn't really matter.

16             The fundamental problem of this is, we don't

17   know, under their construction, what a low incidence of

18   follicular development is.  How does it have to compare?

19             And in this demonstrative, Your Honor sees

20   hypothetical oral contraceptives A through D, and we are

21   comparing it to the normal menstrual cycle as they have done

22   in their brief.

23             How much lower does the incidence of follicular

24   development have to be on these other oral contraceptives to

25   be said to have a low incidence?  Is it any increment, or is

1     it an increment like with C, or is it some other increment?

2                 Where do we draw the line?

3                 To simply say compare it to a normal menstrual

4     cycle doesn't answer the fundamental question:  What does

5     low mean?  There is no standard.

6                 Are we saying we need a precise numerical

7     percentage?  No.  But we do need an objective standard.

8                 Bayer suggests in its brief that there would

9     have been a known standard, a known default standard in the

10    art, someone would just know what this cutoff was.  They

11    cite these four examples of extrinsic evidence.  Not one of

12    them even mentions this phrase "incidence of follicular

13    development."  And none of them identified that threshold.

14                Where do you draw the line that would tell you

15    what the scope of the claim is?  That would tell you how you

16    would conduct an infringement analysis?  How do I know if I

17    am in or I am out?

18                There needs to be an objective way to assess

19    that.

20                They point at Dr. Shulman's testimony that

21    people can make an assessment of whether it is low based on

22    the studied population, the regimen, and the amount of

23    ovarian activity over time.  What does that mean?  That is

24    not an objective standard.  Just throwing out a bunch of

25    factors that someone could consider isn't getting the job

1    done.

2            And this clinical assessment that he talks about

3    is nowhere present in this '940 patent.

4            Dr. Simon notes that absent more specificity,

5    the dividing line between an oral contraceptive with low and

6    one that did not have low incidence wouldn't have been

7    clear.

8            Now let's talk about the next term,

9    "satisfactory cycle control."

10           Again, fundamentally, the approach is the same.

11   We have this term satisfactory.  We need an objective

12   standard to give some definition to this otherwise amorphous

13   concept.  And the standard suggested in the intrinsic

14   evidence is superiority.  Then the only question is what

15   does better mean?  What does superior mean?  We look to a

16   discussion of what cycle control means.

17           What does cycle control mean?  What we have up

18   here is just a diagram of this 21/7 regimen that opposing

19   counsel discussed.  And as opposing counsel noted,

20   traditionally, in the seven final days of a 28-day cycle,

21   women would bleed because of the withdrawal of hormones.  So

22   they would expect bleeding during this period, this

23   interval.  But they would not during the other days, days in

24   which a combination of hormones was administered.

25           So the fundamental concept when we are talking

1    about cycle control is how well is this contraceptive

2    avoiding this unscheduled bleeding.  And there are different

3    ways of characterizing what that is.  One term for it used

4    in the '940 patent is intracyclic menstrual bleeding.

5         And the patent defines cycle control as

6    incidence of intracyclic menstrual bleeding.  In other

7    words, what is the frequency or the incidence of this

8    unscheduled bleeding?  The lesser the frequency, the better

9    the cycle control.

10         Bayer argues that for purposes of the '940

11   patent, cycle control includes a phenomenon called

12   amenorrhea.  But if Your Honor looks at Paragraph 6 of the

13   '940 patent, at Column 6, Lines 39 through 40, they are

14   specifically distinguishing cycle control from this

15   phenomenon called amenorrhea.

16         So for purposes of this patent, what we are

17   talking about for cycle control, which would ordinarily

18   encompass a wide variety of different measures and

19   characteristics, is incidence of the bleeding.  So then the

20   question is, what does satisfactory incidence mean?  It's

21   the same analysis that we went through before.

22         Bayer's proposal, satisfactory cycle control,

23   parallels its other constructions of these other terms, same

24   problems.  No basis for this "as compared to" language, and

25   no acknowledgment of the prosecution history and the

1    fundamental fact that this term was added to distinguish the

2    claimed regimen from the prior art and that that has a clear

3    effect on the meaning.

4              What do they argue?  Well, I just wanted to

5    highlight that there is this standard that they are

6    proposing is also ambiguous.  What is the problem with it?

7    Well, one of the problems is, where is the line?  We need to

8    know what the line is, whether we are in or we are out.  So

9    where do you draw that line to know where unsatisfactory

10   begins and where it ends?

11             The best that Bayer can do is to cite extrinsic

12   evidence.  And it is highlighted here on the right.  And we

13   have done our best to estimate overall bleeding rates based

14   on these articles.  And they say, well, these people were

15   able to come up with assessments, so, therefore, of course,

16   people know what this means.  This is clear.  That seems to

17   be the argument.

18             What is the problem with that?

19             Well, again, it doesn't tell us what the

20   boundary line is.  I wanted to give just an analogy here.

21   Let's imagine that Congress wanted to impose a tax on the

22   rich.  That phrase by itself would not adequately tell us

23   who all was affected and who was not.  We would need a more

24   precise standard.  The fact that we know that Bill Gates is

25   rich, he is clearly on one side of the line and everyone

1    would agree with that.  And not rich, the homeless person is

2    clearly not, doesn't answer the question about what the

3    dividing line is.  And the Nautilus decision by the Supreme

4    Court last month makes this point, you can't have a zone of

5    uncertainty.  You need more clarity.

6              So to just say satisfactory and point to some

7    examples isn't enough.

8              And, very quickly, this concept, certainly in

9    some instances people absolutely had ideas about cycle

10   control of particular regimens.  But in terms of an overall

11   standardization of methods, this 2007 article by this group

12   of thought leaders notes that there wasn't even a

13   standardization of methods over ten years after as to how

14   you would analyze this cycle control data.

15             There was no clear delineation of some accepted

16   standard.  And the Weisberg chapter that Bayer cites in its

17   brief as extrinsic evidence makes the point that different

18   women respond differently to bleeding.  Adolescents will

19   respond differently.  So there is no single line for

20   satisfactory.  People will have different ideas about that.

21             So that's our summary of our construction.

22             Let's move to "reliable avoidance of intracyclic

23   menstrual bleeding."

24             We are proposing the same construction.  The

25   reason we are doing that is, as I have discussed before,

1    cycle control is defined by the patent in terms of incidence

2    of intracyclic menstrual bleeding.  And the standard for

3    reliable avoidance is again one of superiority.

4            So it is the same.

5            "Reliable avoidance of undesirable side

6    effects," last term in this set, again, it's the same

7    analytic approach.  We need a standard.  The only thing that

8    I want to focus on is, again, some additional flaws and

9    additional questions raised by the Bayer construction that

10   makes their construction only raise questions rather than

11   resolve them.

12           Let me just back up.

13           To compare this reliable avoidance to a

14   population of healthy women not using hormonal birth control

15   is nonsensical because women who don't use contraceptives

16   won't have side effects.  So when we do a comparison and we

17   say, as compared to a population not using hormonal birth

18   control, we are really comparing women who have -- assuming

19   they are not using any contraception -- women who have no

20   side effects compared to women who do.

21           Again, we have the same line-drawing problem

22   with their construction.  At what point does one cross the

23   line from reliably avoiding a side effect to no longer

24   reliably?  What is our standard?  What is our objective

25   standard?

1          This doesn't offer it.

2          Bayer points out that we need to look to

3    characteristics in the underlying population as a control.

4    That is not evidence from the construction on its face.

5    They just say that.  But even indulging that, the same

6    fundamental problem arises.

7          So in this example, we are comparing these oral

8    contraceptives, these hypothetical contraceptives on the

9    right to this population of women not using hormonal birth

10   control.  And we are assuming that the incidence is 15

11   percent.  That just raises the same question:  How much

12   greater can this condition be for an oral contraceptive to

13   still be said to reliably avoid a side effect?

14         There is another fundamental problem with their

15   construction.  There are several undesirable side effects

16   for oral contraceptives.  And they range from minor,

17   relatively minor to life-threatening.  Nausea, not a good

18   thing but it won't kill people.  Stroke can.

19         So what is the standard for each of these side

20   effects?  Is the increment over the baseline going to be the

21   same for a side effect like stroke as opposed to a side

22   effect like bloating?  Again, they don't answer that.

23         There are a whole slew of questions that their

24   construction does not answer but instead raises.  That is

25   additional reason to reject it.

1          I wanted to talk about the final two terms.  I

2    wanted to talk about "between these two hormone components."

3          On this, the only reason that we are proposing

4    this term for construction is the fact that Bayer has

5    accused the Warner Chilcott Lo Loestrin product of literal

6    infringement.  The only way that that allegation could be

7    maintained in good faith is if there is a dispute about what

8    this language means.  And under the 02 Micro case, when

9    there is a dispute about ordinary meaning, there needs to be

10   a resolution.

11         So what is it that we are proposing?  That

12   between these two hormonal components means "immediately

13   after a hormone component containing a combination of

14   estrogen and progestin, and immediately before a hormone

15   component containing estrogen only."

16         Bayer proposes, "after the first hormone

17   component and before the second."

18         The fundamental difference between these

19   constructions is that Warner Chilcott includes this

20   immediately term while Bayer does not.  And it is that

21   absence that is the fundamental difference and the

22   fundamental reason why the Court should adopt the

23   construction that we are proposing.

24         I am not going to belabor this, but what we have

25   on the left is a depiction which actually comes from one of

1      Bayer's prior briefs, a depiction of this claim language.

2      And this is one embodiment.  And we have added color to it.

3      But fundamentally, this is a graphic illustration of an

4      embodiment of Claim 1.  What we have between these two

5      hormone components are two or one blank pill days.  That's

6      what we have here.  And then we have a first hormone

7      component, in blue, and a second hormone component in

8      orange.

9              And the claim directs and advises that the first

10     has a combination of estrogen and progestin, and that it's

11     provided for 23 or 24 days.  So that's what we have in blue.

12     And in this instance it's 24 days.

13             And then the second hormone component is

14     essentially an estrogen preparation.

15             As Your Honor noted with Your Honor's question,

16     this does amount to the same thing as estrogen only.

17             So the question here is what does "between these

18     two hormone components" mean.  And to give precision and

19     avoid confusion about claim scope, we would ask Your Honor

20     to adopt the Warner Chilcott construction:  immediately

21     after a hormone component containing a combination of

22     estrogen and progestin, and immediately before a hormone

23     component containing estrogen only.

24             Why is it that we want this term to be

25     construed?  Well, I mentioned before, we have the

1    Lo Loestrin product.  The Lo Loestrin product does not

2    provide placebo tablets between the two hormone components.

3    Yet Bayer is alleging literal infringement.  How is it that

4    they propose to do that?  Well, apparently, they want to

5    extend the inquiry into multiple cycles.  And by using their

6    imprecise definition, they will try to confuse a jury into

7    saying that these placebo tablets are between the first

8    hormone component and the second.

9             What will they argue?  Under their very

10   imprecise construction, all you have to do is be after.  It

11   doesn't matter where or how far after.  You just have to be

12   after.  And all you need to do to be before the second is

13   come at some point before, even if not immediately before.

14            What is wrong with that?  Well, the claim

15   requires that these first and second hormone components be

16   in a single packaging unit, not multiple.  And the Bayer

17   construction is trying to read that out to say we can look

18   at multiple sites.

19            So we would ask that the Court adopt our

20   construction, "immediately after a hormone component

21   containing estrogen and progestin, and immediately before."

22            The last term, "effective estrogen content."

23   Warner Chilcott proposes "a daily dose of estrogen,

24   equivalent to at least 15 micrograms of ethinyl estradiol in

25   the combination tablets, and equivalent to at least two

1    micrograms of ethinyl estradiol in the estrogen-only

2    tablets."

3              Bayer is proposing "no more than 40 micrograms."

4              In principle, what is this "effective" term

5    doing?  What function is it serving in the claim?

6              Effective is a limit on how low one can go.  As

7    one lowers estrogen, you can impair contraceptive efficacy.

8    So the question is, how low does that have to be?  What is

9    the boundary, what is the minimum bound?

10             We would note that, as opposing counsel noted,

11   the object of the invention is to make available a

12   combination preparation with an estrogen content that is as

13   low as possible in each individual dosage unit.  What does

14   that mean in terms of what should be preferred if something

15   lower than 15 would be effective?  It would mean that they

16   would preferred something less than 15 micrograms.  That's

17   what a person of ordinary skill in the art would understand

18   in that first hormone component.

19             So we are proposing "equivalent to at least 15

20   micrograms of ethinyl estradiol in combination tablets."

21   The patent contains a different range, down to two

22   micrograms with the second hormone component.  We are

23   proposing for that "equivalent to at least two micrograms of

24   ethinyl estradiol in the estrogen-only tablets."

25             That may seem a bit anomalous, that you would

1     have two different amounts, but Your Honor should keep in

2     mind that what we have here is the 21/7 regimen that I

3     talked about before.  This is the traditional regimen.  All

4     that these estrogen-only, the estrogen-only tablets are

5     doing is providing some amount of estrogen where previously

6     no estrogen was provided.

7             So to give something as low as two wouldn't be

8     problematic for efficacy.  But when you are talking about

9     the combination tablets, this is the bulk of the regimen.

10    And now we are talking about 24 days.  But historically, 21

11    days had much higher estrogen doses.  The '940 patent notes

12    that at the time 20 was the lowest in a marketed product.

13            So estrogen dose would need to be higher here.

14            Let's talk about the Bayer construction.  They

15    say no more than 40 micrograms.  What are the problems with

16    that?  There is no statement in the patent that if you raise

17    estrogen above 40 micrograms there is going to be a problem

18    with effectiveness.  It doesn't say that.  And they

19    themselves note that 50-microgram products were sold and

20    marketed.

21            They are importing a limitation from the

22    specification.  They are treating a preferred dose of 40.

23    They are doing what they accuse Warner Chilcott of doing,

24    importing a limitation.

25            We would say that the difference here is that

1    the Phillips case notes that when a preferred embodiment is

2    coextensive, as we think that it is, with the 15-microgram

3    dose, that the Court should adopt that.

4              There is no indication here that they intended

5    40 micrograms to be an upper limit.

6              Then the other point about it is, as we talked

7    about before, effective estrogen content, the function of

8    that in the claims is to provide some minimum.  And to just

9    say you can't go above 40 essentially reads out the minimum.

10             The final point that I just wanted to make about

11   claim differentiation, we don't think that that has any

12   merit.  I think they pointed to Claim 1 and Claim 4 as being

13   the same under our construction.  It's not, among other

14   reasons, because Claim 4 has a narrower set of estrogens and

15   progestins than Claim 1.

16             That is my presentation.  We appreciate Your

17   Honor's time.

18             THE COURT:  Thank you, counsel.

19             Brief reply.

20             MR. FORD:  Yes.

21             THE COURT:  I have the slides, counsel.  I can

22   do without that.

23             MR. FORD:  It's just to orient.

24             THE COURT:  I am pretty well oriented.

25             MR. FORD:  Point taken, Your Honor.

1              First, does your Court have any questions?

2              THE COURT:  If I did, I would ask them.

3              MR. FORD:  I appreciate that.

4              Your Honor, very briefly.

5              The prosecution history itself, with respect to

6    the reading of these two sentences in which it's stated that

7    Bayer's patent had achieved for the first time each and

8    every one of these results, when read in the context of the

9    paragraph, it is stating that Bayer has put together a

10   regimen using a low effective estrogen content, low total

11   hormonal content that achieves the effects that follow.

12             The prior art, the Ehrlich and the Pasquale

13   reference, and Luchnit reference all state that the object

14   of those inventions is high contraceptive reliability.  That

15   was known at the time.  And it would not have made sense for

16   Bayer to claim, in a rejection over patents that claim high

17   contraceptive reliability, that they have achieved high

18   contraceptive reliability for the first time or superior

19   contraceptive reliability for the first time.

20             Instead, the effects themselves are again part

21   of the contraceptive regimen that is the profile that is set

22   forth.  And it's a balancing act that must be achieved.

23             In reading the prosecution history, Bayer has

24   obtained the patent by saying that these results, meaning

25   the use of a low effective estrogen content, low total

1    hormone content, whereby these characteristics are

2    attendant, is what differentiates it from the prior art, not

3    that each individual circumstance is improved over the prior

4    art.

5           I can say for the record that we are not seeking

6    literal infringement.  So for purposes of the "between the

7    two hormone components," we didn't think there was much of a

8    dispute.  But that term I don't think needs much

9    construction there.

10           Unless the Court has any other questions, I will

11    end there.

12           THE COURT:  I guess the fact that you are not

13    any longer seeking a finding of literal infringement will be

14    welcome news to the other side, and inform at least to some

15    degree the proceedings, pretrial proceedings.

16           Yes, counsel?

17           MR. SONNENSCHEIN:  The only thing that I would

18    clarify -- there is also an interference claim.  That

19    requires the Court to ask whether each of the claims would

20    anticipate each other.  So the construction would still

21    matter.  I guess the question is why they are not willing to

22    just agree to our construction.  It is just effectuating the

23    plain and ordinary meaning.

24           THE COURT:  Is there a reason?

25           MR. FORD:  If it will facilitate things, we can

1    adopt that construction.  That's fine.

2                    MR. SONNENSCHEIN:  Wonderful.  And thank you.

3                    We have nothing else.

4                    THE COURT:  Everything else is going okay?

5                    All right.  Thank you, counsel.

6                    (Counsel respond "Thank you, Your Honor.")

7                    (Court recessed at 11:22 a.m.)

8                              -  -  -

9    Reporter:  Kevin Maurer

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25